Council for Appellant and 22-1024 Bradford v. U.S. Department of Labor. Council for Appellant if you make your appearance and proceed please. Good morning and thank you for your support. Caleb Kruckenberg on behalf of the appellants in this matter, Duke Bradford, Arkansas Valley Adventures, and the Colorado River Outfitters Association. Obtaining a permit to use federal lands is not an agreement except any future condition on all future activities that the government desires. My clients in this case operate river rafting services on federal lands and they pay the government to obtain special use permits to do so. But those permits are very clear. They say that the outfitters, not the government, are the ones that provide services to the public. In fact, those agreements even say that the outfitters shall not attempt to portray the activities as being conducted by the government. But the Department of Labor has now claimed the authority under the Federal Procurement Act to require those same outfitters to abide by a new minimum wage rule for all of their activities, even those that do not occur on federal lands. But the Procurement Act can't be stretched that far. And we have at least three different reasons why the rule is invalid. The first and I think most obvious is that the Procurement Act does not allow rulemaking concerning non-procurement activities that do not involve the federal government. The special use permits, as I discussed, they don't relate to the statutory elements of the Procurement Act for procuring and supplying non-personal services by the federal government. None of those conditions are present. Second, the rule is not necessary for an economic and efficient system of procurement. As a prior administration recognized, when you use a wage rule like this against outfitters or against this segment of the population, it's not economical. It raises prices and it causes negative employment impacts for these same companies. There are two things embedded in number two. One, whose judgment is it? What is economical and efficient? I mean, the way you expressed it, that would suggest your clients are making that judgment. That's not a judgment that's vested in them to make, is it? No. And so when we're talking about economical and efficient procurement policy, it says necessary in the president's discretion. But I think what we have to look at is we have to look at the way the Supreme Court has instructed. We have to read those kinds of terms. That's where I think the Alabama Association of Realtors case is very instructive here. That was a nearly identical statute. That said, as the secretary determined was necessary for health and safety, the Supreme Court said that has to mean something, not just secretary thinks that, it has to objectively be true. And I think that kind of... Objectively be true or objectively be a reasonable construction of what those terms could mean. I think that's right. Okay. Well, the fact that the Trump administration had one view on economical and efficient doesn't mean that the current administration can't have their own view. And the second part, which I was going to get to embedded in your statement was the notion that economical and efficient means price reduction. And I don't think the president has taken the view that it does mean that. And what is so self-evident that it has to mean that? So there's two things. And I certainly agree with you, Your Honor, that President Trump's current administration's determination, that doesn't present the answer. I mean, this is an answer for the court, but it is good evidence. I think there's a strong disagreement. And I think what you can look at is the regulation itself, the evidence that's presented by the department. And when we look at it specifically with respect to outfitters and guides, which they call non-procurement contractors, they don't point to cost savings. They say this rule will actually negatively affect this segment of the population. It will raise prices, it will cause disemployment. They said all of these negative things. And they talk about morale and health and all those things. And that's what they try to process. That's what they try to process. Well, I mean, from a perspective of efficiency, if somebody shows up bright and sunny in the morning and has had a good night's sleep and has been well compensated, well, why is that unreasonable? Perhaps not the only one, but why is that not an unreasonable construction of what it means to create an efficient workforce? Well, I think that goes to a line drawing question for the court. How much objective measurement do we have to include here? We have to include something. It can't just be an intangible, we think employees might be happier. And I think if you look at the Sixth Circuit and the Eleventh Circuit interpreting the same contractors, they talk about these same kind of non-economic factors, morale, health and safety. And they talk about, and they say, both of those works determined, that is not what this statute is talking about. Because remember, this is a procurement system. That's what the economical and efficient is modifying. So it has to have some connection with obtaining services or obtaining supplies, procurement, to the federal government. It can't just be in the downstream. This company will have morale impacts on their employees off site, off of federal land. Well, isn't it how the company provides services to people who are availing themselves of their creating a structure of licensees who know are not providing government services, but the government field has some obligation to make sure they're not running amok and doing things vis-a-vis the people they're serving, right? They're providing economical and efficient services. Well, I mean, that goes back to the first question. Who's providing the services? It's the outliners. It's not the government. And the idea that just as an overview matter, the government can say, we can still regulate how you're providing services, even off of federal lands, just because of the hook of this permit under the Procurement Act. I mean, that, I think, is just a stretch from the very beginning. And the government has said over and over again, you don't have to be a party to any of these. Well, let me ask this question. As it relates to the line drawing, which I think appropriately does lie with us, you spoke about objective indicators or, well, is the objective, in this sense, what is reasonably, reasonably understood these terms to mean? I mean, you're not suggesting that we're in the numbers crunching business of determining what sort of added value comes from one regulatory scheme or another, because if that were the case, I think this is going to be very challenging for this judge to engage in that enterprise. I mean, this is not a numbers crunching enterprise, right? We're talking about the terms. Right. And I think the two limits that other courts have said is a close nexus to economy and efficiency, government savings. That's what they talk about. That's what Conn talked about. That's what the 11th and 6th circuits have just reaffirmed. And they also talk about economic savings. So those are the two conditions here. And how are those things measured? I mean, in what sense are we talking about? I mean, are we going to be having some evidentiary presentation on you saved X dollar for what you provided? I mean, or is it some sort of you save money? You look at the asserted benefit. Yes. And the Department of Labor asserted benefit for my clients is morale and these other non-economic factors. Morale. And if I recall correctly, you can correct me, please, if I'm wrong, but it was morale and also the help of the workforce. And I mean, in turn, and I mean that particularly in the business that your clients are in, that's not an significant factor. I mean, if you're, if you're, if your employees are overworked and they're unhealthy as a consequence of that, or they don't aren't compensated such that they can take care of their health that has downstream implications, does it not? I'm not saying those are not important issues. That's just not contemplated by the procurement act. Because if you look at these same benefits, he's seen class of asserted benefits. And this is, these are almost verbatim to the ones considered by the sixth and 11th circuit in Kentucky and Georgia versus Biden. And the court in both cases said as a class categorically, that's not cost savings to the government as a system of procurement or supply. That's the problem here. It's just the wrong category benefit. And the Department of Labor is a certain, the wrong, the wrong goal, and they're using the wrong statute to do that. And to the extent that it's unclear, we don't know what kind of line drawing we should do. I mean, that's where the major questions doctrine, I think you'll see a very clear answer. Obviously it is a part of this court practice for years. It's also the Supreme court has made very clear that in this kind of situation, this supplies the answer. If Congress was not very clear that this kind of act gave wage rules over non-procurement contractors, then we have to err on the side of disallowing the regulation. Okay. So the, the main one, number one, we have to classify it as a major question. And so what is the question that we're talking about? Is this regulation of non-procurement permittees like your clients, or are we talking about a broader class of people? Well, the argument I am making specifically with respect to my client is non-procurement contractors. And that they classify, they form a major question, the regulation or not of those individuals. For the major questions, we look at the rule itself. We look at what the rule does. Well, well, but I mean, in order to this, we're in the line drawing business and part of the line here is in defining major question. If I recall correctly, that goes towards the sort of broader, well, it goes towards the impact writ large of this regulatory step. Well, if that's true, and I think there was a figure like $1.7 billion talked about it in this case. Well, that related to all contractors and therefore that creates a mismatch. Because if we're talking about the major question being here related to the non-procurement permittees, what's the dollar figure attached to them? And if that dollar figure is nowhere near this $1.7 billion, then it really sort of changes our view of whether this is really major or not. Does it not? What I would say to that is, I think the initial question is, does the procurement act allow a wage rule against anyone? And I think there is a negative there. That's not the case. I don't think that can be justifiable. But that's the major question. Wage rule against anyone? Well, procurement or non-procurement? May I interrupt just a minute? You've only got a minute and 50 seconds left. But I have real doubts about whether the Procurement Act applies because I'm not sure the government procures anything here. But I'd like to have you just spend 30 seconds on the government's implied powers argument that they have inherent power to regulate this kind of stuff. You've got such little time now. Just give me conclusions. I don't want to cross-examine you about it. I just want to hear 30 seconds of that argument. I was just pointing to the D.C. Circuit's decision in Noza versus Perez and Allball, both of those. This is not a housekeeping rule for internal government administration. This very clearly has impacts far outside of internal agencies, including my clients. And there's testimony in the record. I think that is just a sort of nonsensical argument to try to avoid the fact that this is very clearly a rule of general avoidability. And, Your Honors, I would like to reserve my remaining time for rebuttal. Yes, that's fine. May it please the Court, Drew Ensign, Arizona Deputy Solicitor General for the Amici States. You've only got four minutes. What is your topic? We're going to talk about major questions doctrine, and if there's time, the APA claims as well. This case is ultimately controlled by the major questions doctrine, particularly as refined by West Virginia v. EPA. The United States defense overwhelmingly relied on the proposition that no such doctrine exists at all, so much so that they put it in scare quotes all three times they referred to it. But West Virginia makes plain that such a doctrine does, in fact, exist, and that defendants' doubts in scoring were entirely unwarranted at the time, and now, indeed, are outright indefensible. The major questions doctrine demands clear congressional authorization for the power the agency claims, which is not even arguably present here. The central question thus becomes whether the authority to regulate wages for fully one-fifth of the U.S. workforce is a major question, and to ask that question is effectively to answer it. That is precisely the sort of issue of, quote, regulatory power over a significant portion of the American economy, end quote, that West Virginia makes plain is a major question. One-fifth of the workforce being defined is what? Who are we talking about? That's ultimately the scope. That's everyone that the federal government claims is within their power under the Federal Procurement Act. That's what the Sixth Circuit has estimated, that the scope of the regulatory power that's being asserted over, you know, contractors ultimately affects. Well, hence, and is that scope correlated with the $1.7 billion that we're talking about in this case? No, Your Honor, but I think the actual major question under West Virginia is clear that it's the scope of the authority claim. So what West Virginia says is the relevant question is, quote, the breadth of the authority that the agency has asserted, end quote, and that's at 2608. Here, the source of the authority to regulate wages or to revoke the outdoor recreational exception is just yet another manifestation of defendants' asserted plenary power to regulate wages for one-fifth of the economy, as long as they're willing to concurrently mouth the words efficiency and economy. That, you know, there's nothing about the scope of the authority that they've asserted that wouldn't allow them to, say, impose $1,000 an hour minimum wage. And so... Well, is it West Virginia that determines that we are not looking at the scope of authority question as focusing on the non-procurement permittees? In other words, the clients of counsel, party counsel in this case, are not the entire workforce and they're not that full scope of the workforce that would be regulated. And so why aren't we just focused on that group of people? I think because that's how West Virginia looks at it. It makes clear that it's the scope of the authority asserted and not how it's being exercised in the particular case. All right. So even if this were a rule that merely upped the wage from $10.30 to $10.40 an hour, it's still a major question because the underlying authority that's being claimed, which is the authority to regulate wages for the fifth of the economy, essentially displacing Congress for 20% of the U.S. workforce, that is a major question. And everything here is a manifestation of that assertion of authority. And whether or not they possess such truly awesome power is indeed a major question. Turning to the APA issues, the rule is also independently invalid if the APA applies because the Department of Labor admits that it did not consider alternatives to a $15 an hour minimum wage or to not repealing the outdoor exception. That refusal plainly violates the APA because there's no just following orders exception to it. So the dispositive question is whether the APA applies. And the D.C. Circuit's decision in Chamber of Commerce makes clear that it does. It says that the existence of a presidential executive order hardly seems to insulate defendant's actions from judicial review under the APA. And the Ninth Circuit has gone even to Chamber of Commerce to say agency regulations that implement an executive order are reviewable under the APA, end quote. That's 932 F3rd at 770. So there simply is no just following orders exception to the APA. And because that's the defense of the explicit refusal to consider alternatives here, the rule necessarily fails under the APA as well, as well as for lack of statutory authority under the Procurement Act. And I see I'm out of time. I certainly welcome any questions, but thank you, Counsel. Thank you, Your Honors. Good morning, Your Honor. I make this report in the name of the federal government. The Federal Property and Administrative Services Act, or APOSSA, confirms the president's authority to issue directives. Is that better? Better? Yes. Thank you. Let me start. The Federal Property and Administrative Services Act, or APOSSA, confirms the president's authority to issue directives to executive branch agencies about the terms on which they should enter into contracts. In the order implemented by the rule challenged here, the president determined that the government should choose to contract only with companies that pay their employees at least $15 an hour for work performed on or in connection with a federal contract. And I need to correct a point made by Mr. Krockenberg a couple of times on this issue. What is asserted here is not the power to set a minimum wage paid by any federal contractor for any work on or off federal lands. This is an order saying when you, a federal only with a company that is willing to pay their workers $15 an hour for work on or in connection with the contract. If they don't want to renew a permit, that's fine. If they don't want to, they can pay their workers whatever they want for work off federal lands. This is a very, very narrow authority about the people with whom the federal government should choose to contract. That order carried forward a similar directive with a lower wage rate that had been in place since 2014 and through the entirety of the Trump administration. Now Clint has fallen into the small category of contractors who do not provide goods or services directly to the federal government. And their primary argument is that the president's authority under FPASA doesn't cover contractors like them, but that ignores the statutory text, which articulates the objective of the statute to include quote, an economical and efficient system for procuring and supplying property and non-personal services. What is the government procuring? That's what I'm confused about. What is the government procuring? The government isn't itself getting any guiding services. The government is merely enabling guiding services to be procured by other private individuals. We certainly agree, your honor, the government as to this particular group of contractors. The question, what is the word you're talking about? Is supplying. So the statute says procuring and supplying. The government is not supplying anything either. I mean, I just have trouble with both of those words. So your honor, the government we think is supplying recreational services here in the following sense. When somebody wants to hire a guide, they're not going to the government and say, supply the guide to me, please. They're going right to the guide. Very much agreed, your honor, but the statute refers to a system for, among other things, supplying non-personal services. So the way we think about it is this. These are federal lands. The federal government has an interest in people being able to recreate on these lands and in people who provide recreational services. Well, there's no doubt the federal government has interest. I don't doubt that at all. But my question is, I just have trouble applying the Procurement Act here, period, because I don't think they supply services and I don't think they procure services. So your honor, the reason we think this is a natural, it's natural to think the government supplying services here is if you start from the premise that these are federal lands, the government wants people to be able to use these lands. It has various choices about how it's going to go about doing it. It could supply those services by having federal employees lead rafting trips, or it could choose to do what it's done here, which is say, we're going to enter into agreements with private companies who will pay us a share of their revenues in exchange for the privilege to lead rafting trips on these lands. The government has made the second choice. That doesn't change the fact that what the government is doing here, that this is a system for supplying non-personal services, even if the government, by virtue of the choice I just described, is not the one leading the raft trips. And I think the key point, your honor, is that- Well, the government is not supplying rafting services. The government is allowing other private people to supply them. So you are saying, I guess, that that means the government indirectly is supplying those services. That's right, your honor, and- The government is enabling their supply. Yes, but the key point, your honor, that this is federal land. So it's not that at any time the government enables anybody to do anything, the government is sort of doing it or supplying it. I think it's just crucial to regard this within the context of this is federal land, the federal government has a system for making these services available on the federal land, and this is the way they've chosen to do it, as opposed to by providing those services themselves. And crucially, under plaintiff's view, the word supplying doesn't have any meaning. Plaintiff's view is this statute is limited to contractors who provide goods or services directly to the federal government, but that's procuring. Plaintiffs have no satisfactory explanation of what the word supplying means under their view of the statute. Every example they give proves the point. They say, for example, if the federal government runs a campground, and it hires somebody to help it run the campground to provide food services or clean the latrines or something, that that's supplying. But what the federal government is doing in that example is it's paying that company, it's procuring that company's services to do the cooking or the cleaning or whatever else. There's just no example, there's no real world example of the government supplying something that would be considered non personal services under this statute. So that's why I'll grant that this isn't necessarily the first thing you would think of. If you said what's happening here, you wouldn't necessarily say the government supplying these rafting services. But we do think it's the most sensible interpretation of the statute, given that plaintiff's alternative interpretation would render the word supplying surplusage. I didn't catch your response to the idea, here anyway, your response to the idea that this affects off federal land, that this is not just limited to what plaintiffs do vis-a-vis their employees on federal land, but it extends to the government's effort to regulate their relationship with their employees even off federal land. With respect, your honor, it's just not right. I mean, this rule tells federal agencies when you have new or renewed contracts, you must include in those contracts, a clause that says the contractor must pay their employees $15 an hour for work performed on or in connection with the federal contract. Now as to federal land, it's probably the person who's at ADA's headquarters taking reservations is performing work in connection with a federal contract. And if that person does it for more than 20% of their time under this rule, that they must be paid $15 an hour for those hours. But they don't have to be paid $15 an hour for the work they spend, for the time they spend booking other trips. And certainly any guide... Counsel, I'm sorry, but how is that realistic? How would you pay the RAF guides $15 an hour? Are you suggesting while they're in the part of the river that is covered by federal land, and then when they're not on federal land, they can pay anything that they want or within other laws? I am not sure how you're parsing that. So your honor, there may be some tricky application scenarios. I don't think they're presented here. I think ADA's trips are, that we're talking about, the ones covered by this federal land. Possibly I'm wrong about that. But as a matter of concept, nothing is being regulated here. First of all, this is an exercise of proprietary authority, but it's telling federal agencies when you enter into these permits, do it only with companies that are willing to pay their employees $15 an hour for work on or in connection with federal land. What if a contractor says, okay, we're willing to pay $15 an hour for that stretch of the river on federal land, but the stretch off the federal land, we're not going to pay $15 an hour. This is apropos of Judge Iye's comment, which I'm intrigued about. Would that pass muster or not? Your honor, I actually don't know the question, the answer to the question about how the Department of Labor in applying this rule would think about that exact scenario, a RAF trip partly on federal land and partly not. But in terms of the assertion of authority here, in terms of what this rule does, this is absolutely not an exercise. It's not an exercise of regulatory power, period. Certainly not, as plaintiff's counsel described it, an exercise of the power to regulate a fifth of the federal line, whether or not- In any event, you earlier said, I think that these contractors, there's no indication or that there is affirmative indication maybe that their permits and their That's a question for a different day. Is that right? Or will we discover in the record that this only involves rafting trips entirely on federal land, so we don't need to address the other issue today? I mean, certainly AVA leads lots of different trips on and off federal land. I think as to the question whether the particular, I mean, we're talking here, the permit that they had to renew in March 2022, the one that contains this, well, I guess it doesn't contain this was enjoined pending this appeal, but I don't think they have any contract actually that contains this provision, but that was the basis of their standing. And so as to whether the rule, the trips they conduct on the Eagle River also go on non-BLM land, I just don't know the answer to plaintiff's counsel may, but in terms of the assertion of authority here, in terms of what this rule does, this is an assertion of authority limited to entering into contracts with companies that are willing to pay workers $15 an hour for work on or in connection with the federal contract. It's much more limited than plaintiff's counsel or their amici have suggested. Well, what about amici suggesting that it does relate to one-fifth of the workforce and that at play here is the scope of the asserted authority, the right, the authority to regulate and impose, essentially require in contractual relationships, the imposition of a minimum wage. Why isn't that correct here? So your honor, I think the major questions doctrine doesn't shed light on this case for several different reasons before you even get to the question of how big is this rule? Before you get to those several questions, answer that specific question so that it's clear to me what the answer is to that. Well, you know, I think the answer to the several questions is this case just doesn't implicate a question about what would happen if an agency tried to regulate the wages of one-fifth of the U.S. economy. The basic reason the major questions doctrine is inapplicable is that that's a doctrine about assertions of regulatory power with vast economic effects. This isn't an assertion of regulatory power at all. This is a directive to federal agencies that when they are entering into contracts, they should do it with companies that are willing to pay a minimum wage, not do it with companies that are not. That's not an exercise of regulatory power. Why is it not since DOL issued a regulation, did it not, to implement that directive? It may be called a regulation, but your honor, there is a distinction between regulatory and proprietary authority. If you look at Perkins versus Lukens Coal, the Supreme Court's decision addressing the Public Contracts Act, which requires the payment of prevailing wage to certain contractors, the Supreme Court said that did not more than instruct its agents to fix the terms and conditions under which the government will permit goods to be sold to it. It's really a crucial distinction. There's also not, this is not an assertion of power based on a cryptic delegation of authority. The terms of the Procurement Act, the delegation of power to the president to prescribe policies and directives is quite broad on its face. There's no concern about political accountability when delegating authority to the president himself. The statute is bolstering inherent constitutional powers of the president. And that all brings us then to the question of whether this is even, even if all of that weren't true, whether the matter before the court is one of vast economic or political significance. Whatever Amiki may want to say about how broad a directive could be, what effects it could have, this rule, even if you consider the rule as a whole, as opposed to just its application to non-procurement contractors, much less its application to wilderness recreational providers. The agency expected that only one-fifth of one percent of the U.S. workforce would see increased wages under the contract provisions required by this executive order. One-fifth of one percent of the U.S. workforce. That's by comparison with, you know, the recent Supreme Court decision about the OSHA vaccine or test rule, which was going to affect more than half the U.S. workforce. I mean, this is just, this is far, far from anything the Supreme Court has regarded as a major, as an exercise of regulatory authority, excuse me, with vast economic. Is that same reasoning, as it relates to this not being an exercise of regulatory authority, does that same reasoning bleed into why there is not an APA problem here relative to the DOL's regulation or not? In other words, their argument is that there is an APA problem because there were not alternatives considered to the $15 minimum wage that the President directed. I think that's a distinct issue, Your Honor. I don't think it relates to the… All right, then. Well, give me, give me your response to their argument there. So this, this court has explained in New Mexico Health Connections versus HHS that quote, the APA's requirement that an agency explain its decision applies when the agency exercises its discretion, not where there was no exercise of discretion to explain. The agency here in this rule, the agency had discretion on certain points. It did not have discretion on others. And as to the points they're challenging, whether this, whether this requirement in contracts exists at all, whether the 2018 exemption for recreational service providers is rescinded, those were decisions made by the President, not by the agency. And they were made in the exercise of authority, specifically delegated to the President by Congress. So as far as I can tell, Plaintiff's argument rests on the idea that after the President, exercising power specifically delegated to him, has made a choice to do X, the agency should have felt free to do not X, to do Y. And they should have explained their, you know, thinking on why they should do X and they should have seriously considered doing Y. That doesn't make any sense. I mean, the power is committed by statute to the President. All the agency was doing here was implementing, all the agency was doing here in the process of what they're challenging was implementing that directly. The agency did do other things in this rule. It did resolve questions not resolved by the President. As to those issues, they certainly could have brought an arbitrary and capricious challenge, but that's not what they've done here. So we don't dispute that the APA applies in the sense that they have a cause of action, that there's a waiver of sovereign immunity to challenge this implementing rule. But the APA, they cannot review under the arbitrary and capricious standard, the basic choice to require this in contracts and to rescind the 2018 exemption because those were choices made by the President and the President is not an agency under the APA and the Supreme Court's decisions. Would you indulge me? I waited too long on your moment to ask this question. Would you give me 30 seconds and no more than 30 seconds of your comment about an inherent authority to adopt this rule? Unsevered from the Procurement Act. So on that point, Your Honor, I mean, the EO does begin in the exercise of my power under the Constitution and various statutes, including AFPASA. We haven't asked the court to uphold the denial of a preliminary injunction on the theory that even if this isn't authorized by AFPASA, it's authorized within the President's inherent powers. So it's not an issue here. It's not an issue in this case. I think it's an issue in the sense that some of plaintiff's arguments are confirming inherent powers. So, for example, in the major questions doctrine, I think, you know, the concern about regulatory overreach overextending beyond an authorization delegated by Congress is significantly diminished where a statute is bolstering an inherent constitutional power of the President. So I'm not saying that the fact that there's inherent power here is irrelevant. I'm just saying that we haven't. It's not. It's not. That's all I need. Thank you. Yes. I'm happy to take any further questions the court may have. Otherwise, we ask that the denial of this preliminary injunction be affirmed. I think that's fine. Thank you. Thank you, counsel. Round it out to a full minute, please, and then we'll go from there. And, Your Honor, I want to start my rebuttal where they ended, and that's really talking about the relief that we're requesting here. We're essentially just asking this court to extend the injunction that was already put in place by the motions panel. And the question here is really, I mean, we've talked about the merits exclusively. The question is whether there's a substantial concern that this rule is unlawful. And I think there very clearly is. And whether that is on a plain statutory language question, whether that is with the invocation of major questions doctrine, I think this court simply has to look at the two decisions from the Sixth Circuit and the Eleventh Circuit reviewing very similar types of regulations using the same statute. And no matter how you claim statutory text or resorting to major questions doctrine, this goes too far. And there are approximately 40,000 firms just like my clients that are non-procurement that are seeking relief. Thank you, Your Honor. Thank you, counsel. Thank you both. Very fine arguments. Case is submitted.